UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.  1:12-cr-00142-SEB-MJD-02 |
| | ) | |
| DENNIS FURST, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER OF DETENTION PENDING TRIAL

The Defendant, DENNIS FURST, is charged in this cause with a single count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.

On April 22, 2013, based on his petition to enter a plea of guilty to the Indictment, FURST was scheduled for a change of plea and sentencing hearing.  Immediately prior to the commencement of the hearing, motions were filed by the parties which put Defendant's plea in question.  At the hearing convened by the Court, attorneys for the defendant, C. Joseph Russell, Brian Strawbridge, and Stephen Cho, all moved to withdraw their representation of FURST.  In addition, the Government moved to withdraw from the plea agreement.  All motions were granted by the Court.

The Court next addressed the issue of pre-trial detention based on these developments and information.  The Court appointed Joseph Cleary of the Indiana Federal Community Defender's Office to represent FURST until a decision could be made by Defendant in terms of securing replacement counsel.  The Government sought to have the Defendant detained, pursuant to Title 18,

United States Code, Section 3142(f)(2)(B), on the grounds that he has obstructed justice, and that he poses a risk of continued obstruction of justice as well as a risk of economic harm to the victim and to the public at large.

At the detention hearing, the Government established through clear and convincing evidence that defendant, while on pretrial release, undertook to obstruct justice and commit new crimes against the victim in this case; that the defendant poses a continuing economic harm to the victim and community, if released; and has violated the terms of his original pre-trial release conditions. As a result, the Court ruled that, based on the evidence adduced, there are no conditions or combination of conditions that reasonably could ensure the public's protection or that the defendant would comply with the court-imposed conditions of release. The Defendant was therefore DETAINED pending trial of this cause.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      FURST is charged in an Indictment with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

2.      The maximum penalties for a violation of Title 18, United States Code, Section 1349 include a term of imprisonment not to exceed 20 years, a fine not to exceed $250,000, and a term of supervised release not to exceed three years.

3.      The Court reviewed the Pretrial Services Report ("PS3") indicating that FURST was previously convicted of theft for which he was on probation at the time of the alleged crime charged in the pending Indictment. The PS3 notes that the defendant's residence is in California.

4.      The Court reviewed FURST's current conditions of pre-trial release, which include, *inter alia*: (1) the Defendant is not to commit another Federal, State, or local crime; and (2) the Defendant is not to have any contact with any witnesses or victims in this case.

5.      In support of its motion for pre-trial detention, the Government called as a witness Danny DiRienzo, Special Agent, United States Secret Service.  Special Agent DiRienzo verified the accuracy  the Superseding Indictment as well as the Government's sealed motions highlighting the following facts:

(1)      Stanley Black and Decker ("Stanley") is a large, diversified corporation with divisions operating throughout the world.  One of those divisions, the Shared Services Division, has offices located in Fishers, Indiana, within the Southern District of Indiana.   One of the responsibilities of the Fishers Office is management of the accounts payable for all of Stanley's corporate divisions.  Stanley utilizes an accounts payable system.  The legitimate payment process involves accessing that system and scanning in numerically identifiable purchase orders which are created by one of the branch offices of Stanley who orders products or services from a vendor.  The vendor next submits invoices and materials receipts tied to the numbered purchase order.  The vendor invoices are checked to see if they match the purchase order and, if they do, the invoices are approved and scanned into the system.  Once these documents are approved and scanned into the system, a payment request is generated and the vendor is paid.  If the purchase order, vendor invoice, and vendor materials receipts are not scanned into the accounting database, the accounting database will disallow payment.

(2)      Co-defendant DEREK BRESKY was an accounts payable supervisor for

Stanley.  One of the responsibilities of BRESKY's unit was reconciliation of disputed purchase orders and vendor invoices.  In this capacity, BRESKY and his entire unit had manual override authority and could cause the Stanley accounts payable system to pay an invoice not in compliance with the above described procedures and controls.

        (3)    365 Electrician, Inc. ("365 Electrician") is a California company and  a vendor to one of Stanley's corporate divisions.  365 Electrician is controlled by defendant DENNIS FURST.  FURST's point of contact with Stanley's accounts payable division was BRESKY.

        (4)    Beginning in or about April 2012 and continuing through August 20, 2012, BRESKY and FURST conspired to commit wire fraud against Stanley whereby they submitted false invoices and commands for payment for services that were never contracted for or provided, causing Stanley to wrongfully pay 365 Electrician more than $1,600,000.

        (5)    To execute the scheme, BRESKY relied on his knowledge of the Stanley accounts payable system to circumvent the security protocols and requirements to generate payments from Stanley to 365 Electrician.  BRESKY would use either his log-on and password, or the log-on and password of a subordinate, to prompt the Stanley accounts payable system to pay invoices for services that were never performed to 365 Electrician.  BRESKY instructed FURST to create false invoices for work which 365 Electrician had not performed and send them to BRESKY to cover-up the scheme and artifice.  Knowing the invoices were false, FURST created and sent the fraudulent invoices to BRESKY in and about May 2012 through June 2012, the exact dates being unknown.

        (6)    Two days following the return of the Indictment, a plea agreement between Defendant FURST and the Government was executed and docketed. On October 11, 2012, FURST appeared before Magistrate LaRue for his initial appearance and was released on conditions.

Condition 1 stated that FURST was not to commit any other Federal, State, or local crime. Condition 7(g) of his release conditions restricted him from having contact with any victims of the offense. Judge LaRue reviewed, and FURST signed, these conditions in open court acknowledging his understanding and acceptance of them.

(7)     On April 5, 2013, the United States Attorney's Office for this district received an anonymous phone call in which the caller indicated that FURST had recently created a new company, Subcontractor Nation, LLC, and was attempting once again to set it up as a vendor with Stanley. Counsel for the Government conveyed this information to S.A. Danny DiRienzo for investigation. S.A. DiRienzo contacted Stanley and discovered that the Stanley Security Solutions' San Diego office had, indeed, submitted a packet of paperwork to the main office of Stanley asking that Subcontractor Nation be enrolled as a vendor. The packet included, *inter alia*, the name of the Subcontractor Nation's president, Richard Spicer; a California Electricians License in the name of Subcontractor Nation; two California certifications (alarm installation and good management); and general company information such as an address and phone number.

(8)     Based on this information, DiRienzo immediately became suspicious about the legitimacy of Subcontractor Nation. He recognized the business address of Subcontractor Nation as the address of a condominium where FURST and his wife lived before moving into the home which was purchased with fraud proceeds. An open source data base search was conducted revealing that the condominium at that address is still owned by FURST's wife's parents. DiRienzo located Subcontractor Nation's website. The domain name registry records of this website correspond to the postal address of 365 Electricians.

(9)     DiRienzo next examined the license and certifications provided by Subcontractor Nation and found them to be fraudulent.  California officials with the Secretary of State's Office indicated a license had not been issued to a Subcontractor Nation nor a license under the license number listed on Subcontractor Nation's license submitted to Stanley.  Similarly, the California Secretary of State's Office indicated that it had never issued the certifications provided to Stanley.

(10)     Stanley's director of corporate security arranged a conference call with DiRienzo and Tim Colton, operations manager of the San Diego office of Stanley Security Solutions.  Colton, as the Stanley employee, had submitted Subcontractor Nation to be a vendor.  Colton stated that he was contacted on his cell phone by FURST in January of 2013.  Colton recognized the voice as FURST's because they had worked together on numerous jobs and were friends.  Further, FURST identified himself by name to Colton.  FURST asked Colton if Stanley was still looking for electrician contractors.  FURST indicated that he had a friend, a "Jonny Hu" who had a company named Subcontractor Nation, who did good work.  Colton indicated that he asked FURST if FURST was involved with Subcontractor Nation, and FURST denied any involvement with the company.

(11)     When Colton asked about the pending Indictment, FURST told Colton, in effect, that the charges were not well founded, but he was given such a good plea offer he would have been stupid to fight it and that it was not a big deal.  Colton stated that FURST was very convincing, so he gave a job to Subcontractor Nation and submitted the paperwork to Stanley for approval as a vendor.  Stanley provided Colton's company cell phone records, which reflected seven

calls of varying lengths between FURST and Colton from January 18, 2013 through January 31, 2013.

(12)     DiRienzo determined that Jonny Hu is a real person.  According to Hu's Facebook page, he is the vice president of sales for Subcontractor Nation.  DiRienzo attempted to contact him via email, but Hu did not return any of DiRienzo's messages.

(13)     On April 19, 2013, DiRienzo placed a "ruse call" to the main phone number of Subcontractor Nation via his cell phone from AUSA Shepard's office.  A female answered saying "Subcontractor Nation."  DiRienzo asked if he could speak with Dennis FURST.  The receptionist did not deny knowing a Dennis FURST or that he could be reached at that number.  Rather, she asked who was calling, where DiRienzo was calling from, and what the call regarded.  DiRienzo disconnected the call before reaching FURST.  Within two minutes, FURST contacted DiRienzo on his cell phone saying he wanted to talk.  DiRienzo stated that because he now had an attorney, neither DiRienzo nor Shepard could speak with him without first receiving permission from FURST's attorneys, Stephen Cho or Joe Russell.  FURST placed several additional calls to DiRienzo's cell number and the United States Attorney's Office main phone line.  After the fifth or sixth call, AUSA Shepard accepted the call, telling FURST explicitly that since formal charges were pending neither he nor DiRienzo would speak with him without Mr. Cho or Mr. Russell's express permission.  After FURST said he waived his right to have counsel present and wished to talk, Shepard told him that pursuant to the Sixth Amendment, he could not waive it, only his attorney had that authority.  Shepard further stated that he (Shepard) would contact Mr. Russell.  Shepard suggested to FURST that FURST contact Mr. Russell as well.  At no time did Shepard or DiRienzo

allow FURST to make any substantive comments to them in the course of these calls.  Later that evening, Shepard contacted Russell via cell phone to relay the foregoing events.

(14)    Stanley indicated that Subcontractor Nation had submitted a work invoice for one job for which Stanley was about to make payment when Stanley was contacted by the Secret Service.  After learning of FURST's involvement in Subcontractor Nation and the fraudulent electrician's license, Stanley suspended payment and ordered that no further work be given to Subcontractor Nation.

(15)    DiRienzo continued his investigation discovering that the proof of the insurance paperwork submitted to Stanley was false.  DiRienzo spoke with a representative of the National Insurance Crime Bureau who reported that the policy numbers either do not exist or do not correspond to the purported policy.  Further, a representative from State Farm Insurance also confirmed that the purported insurance policy was false, based on the fact that the company does not have any authorized agent whose name matches the name listed as the authorizing agent.

(16)    DiRienzo also contacted a sampling of the people who purportedly wrote letters to the Court in support of the defendant at sentencing, in an effort to determine if they were authentic.  One individual, "C.D.", indicated that his letter was legitimate, but disclosed that he ("C.D.") is employed by FURST at Subcontractor Nation.  (This fact further confirms FURST's involvement in Subcontractor Nation.)

(17)    DiRienzo spoke with "S. M.'s" wife about the letter purportedly written by "S.M." to the Court. She verified the phone number listed as belonging to S.M., but noted that his name is misspelled (he uses a "u", not a "w" in his first name).  She further stated that she knew

her husband had not written any such letter.  "S.M.'s" wife provided DiRienzo with the contact number for "S.K."

(18)    DiRienzo also contacted "S.K.", who stated that she ("S.K.") is a close friend of FURST's wife and that she was aware of FURST's legal situation.  She denied writing or signing any letter to the Court on behalf of FURST.  DiRienzo also spoke with "P.F.", who also denied writing a letter on behalf of Furst to the Court.  After speaking with her husband, "P.F." stated that her husband likewise had not written any letter to the Court on FURST's behalf.  DiRienzo did determine, however, that the letters submitted by persons affiliated with United Way were apparently legitimate.

(19)    After counsel for the Government notified United States Probation Officer Billie Galbreath of this information, she attempted to contact some of the individuals who purportedly had written letters in support of the defendant.  Officer Galbreath has confirmed that while "A.L." and "S.H." reported that they had in fact written letters of support, "C.P." denied submitting a letter of support.

6.    The Government proffered Government's Exhibits 1-9.  Exhibits 1-7, which are documents provided to Stanley by Subcontractor Nation.  DiRienzo testified that the addresses listed in the exhibits 1-7 correspond to a previous address for FURST.  DiRienzo detailed the false information set out in the tendered exhibits.  Exhibit 8 contained an address for Subcontractor Nation which matches the address for 365 Electrician contained in its web domain registration. DiRienzo testified that Exhibit 9 shows that Subcontractor Nation did not even exist as a business at the time the certificates (Exhibits 4-7) were purportedly issued.

7.    DiRienzo testified that FURST's permanent residence is in California, and had been

purchased with proceeds of the alleged prior fraud scheme.

8.      Regarding the legitimacy of Hadley Insurance, DiRienzo testified that he did not know if it actually existed, but the phone number and policy numbers listed on the declaration sheet were not valid.  DiRienzo was unaware of the extent of work performed by or agreed to by Subcontractor Nation on behalf of Stanley.

9.      The defense proffered that, prior to these two instances, FURST had been cooperating with the Government in the pending litigation.  The defense further promised that FURST would immediately divest himself of any role or interest in Subcontractor Nation.  No information was forthcoming from FURST or by his counsel regarding the false letters sent to the Court ostensibly in support of FURST's sentencing.  The defense sought home detention for Defendant on the grounds that it would satisfy any concerns by the Court at this point.

10.      A detention hearing was conducted on the Government's motion, pursuant to Title 18, United States Code, Section 3142 (f)(2)(A), which alleged that a serious risk exists that the Defendant will obstruct or continue to obstruct justice, and of continuing harm to the victim, if the defendant were allowed to continue on pre-trial release.

11.       The factors set forth in 18 U.S.C. § 3142(g) were reviewed orally by the Court, culminating in a finding that FURST must be detained as there is no condition or combination of conditions of release sufficient to reasonably assure the safety of the community.

12.      The Court conducted the required analysis, first reviewing whether any of the conditions in 18 U.S.C. § 3142(c)(1)(B) permits pretrial release, and, if not, whether pretrial detention is necessary. *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988).  Under § 3142(f), in addressing whether any condition or combination of conditions set forth in subsection (c) will

reasonably assure the appearance of such person as required and the safety of any other person and the community, the Court considers the eight offenses listed there as well as the two types of risks. None of the eight offenses applies to the case at bar, but the risks do apply.  A defendant is eligible for detention upon motion by the United States or order of the Court *sua sponte* in cases involving (1) a serious risk that the person will flee; or (2) a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, a prospective witness or juror.  18 U.S.C. § 3142(f)(2).  *United States v. Sloan*, 820 F.Supp. 1133, 1135-36 (S.D. Ind. 1993).  These conditions must be supported by a preponderance of the evidence proffered at an immediate hearing. *Friedman*, 837 F.2d at 49.  *See United States v. DeBeir*, 16 F.Supp.2d 592, 595 (D. Md. 1998) (serious risk of flight); *United States v. Carter*, 996 F.Supp. 260, 265 (W.D.N.Y. 1998) (same).

13.     Here, the Government moved for detention pursuant to 18 U.S.C. § 3142 (f)(2)(B), arguing that FURST has obstructed (or attempted to obstruct) justice, that he poses a risk of continued obstruction of justice, as well as a risk of economic harm to the victim and to the public at large.  The Court finds these risks to exist, pursuant to § 3142(g).

14.     The Court concludes that no condition or combination of conditions will reasonably assure his appearance as required or the safety of other persons and the community.  18 U.S.C. § 3142(e).  Detention is required based on Defendant's dangerousness and risk of flight (proof of both is not required).  *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985).  The United States has successfully established by a preponderance of the evidence that if released the defendant poses a risk of flight, based upon the prospect of additional charges against him and potentially a longer sentence.  *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985); *United States v. Himler*, 797 F.2d 156, 161 (3rd Cir. 1986); *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir.), *cert.*

*denied*, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986); *Fortna*, 769 F.2d at 250; *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2nd Cir. 1985); *United States v. Orta*, 760 F.2d 887, 891 & n. 20 (8th Cir. 1985); *United States v. Leibowitz*, 652 F.Supp. 591, 596 (N.D. Ind. 1987). Similarly, the Government has further established by clear and convincing evidence that the defendant poses a risk of safety of other persons and the community. 18 U.S.C. § 3142(f); *United States v. Salerno*, 481 U.S. 739, 742, 107 S.Ct. 2095, 2099, 95 L.Ed.2d 697 (1987); *Portes*, 786 F.2d at 764; *Orta*, 760 F.2d at 891 & n. 18; *Leibowitz*, 652 F.Supp. at 596; *United States v. Knight*, 636 F.Supp. 1462, 1465 (S.D. Fla. 1986). The Court's findings are based on the "reasonable assurance" that there are no conditions or combinations of conditions which will result in the defendant's appearance or the safety of the community. *Portes*, 786 F.2d at 764 n. 7; *Fortna*, 769 F.2d at 250; *Orta*, 760 F.2d at 891-92.

15.     In considering the evidence presented on the issue of release or detention weighed in accordance with the factors set forth in 18 U.S.C. § 3142(g) and the legal standards set forth above, the Court has considered the defendant's character, his family ties, his employment, his financial resources, the remoteness of his permanent residence in California vis-a-vis the court's jurisdiction, his past conduct and history, including criminal history. 18 U.S.C. § 3142(g)(3)(A).

16.     The Court also finds the following:

a.     There is probable cause to believe that the defendant has committed the alleged recent additional acts of fraud against the victim post dating those set out in the Indictment, and has as well tendered false character letters to this Court with regard to sentencing issues.

b.      The testimony by S.A. DiRienzo establishes a strong likelihood of conviction as to the new and the original charges against FURST, particularly in light of his having previously filed a petition to enter a plea of guilty, which petition, to date, has not been withdrawn.

c.      The PS3 reflects that FURST has a history of dishonesty as well as other offenses committed during periods of Court ordered supervision.

d.      Defendant's life exhibits a pervasive pattern of criminal conduct for which home detention would not provide sufficient safeguards.  Accordingly, the Court finds that there are no conditions or combinations of conditions that reasonably will protect the public from further crimes by the defendant.

Accordingly, FURST is hereby detained prior to trial of this cause, and held in a facility separate, to the extent practicable, from persons who have been convicted and are awaiting or serving sentences or being held in custody pending appeal.  He is allowed reasonable opportunities for private consultation with his counsel.  Upon order of the Court, the officials in charge of defendant's custody and control shall deliver him to the United States Marshal for the purpose of further Court appearances.

Dated  05/08/2013

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

-13-

Distribution:

Bradley P. Shepard
United States Attorney's Office
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204
(317) 226-6333

Joseph Mount Cleary

U.S. Probation, Pre-Trial Services

U.S. Marshal Service